Filed 10/29/21  P. v. Boston CA3

<u>NOT</u> <u>TO</u> <u>BE</u> PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>STEVIE LEE BOSTON,<br><br>        Defendant and Appellant. | C086940<br><br>(Super. Ct. No. 16F4160) |

A jury convicted defendant Stevie Lee Boston on five counts of forcible oral copulation, three counts of corporal injury to a cohabitant, two counts of kidnapping, two counts of robbery, one count of assault with a deadly weapon, and one count of assault with force likely to cause great bodily injury.  The trial court sentenced defendant under the one strike law and the three strikes law to an aggregate determinate term of 50 years, plus an aggregate indeterminate term of 164-years-to-life.

Defendant now appeals and contends (1) the prosecution's use of a peremptory challenge on an African-American prospective juror violated his constitutional rights; (2) the trial court erred by closing the courtroom for the court trial on the prior conviction allegations; (3) defendant's convictions on two counts of robbery must be reversed

1

because the thefts were by false pretenses, not by larceny; (4) the convictions for assault with a deadly weapon and assault with force likely to produce great bodily injury must be reversed because there was insufficient evidence defendant used a belt as a deadly weapon or in a manner likely to cause great bodily injury; (5) the prosecutor committed prejudicial misconduct by asking a witness questions on cross-examination about whether she considered invoking her privilege against self-incrimination and that, if he forfeited consideration of the issue on appeal by failing to object, his trial counsel provided ineffective assistance of counsel; (6) he was 20 years old at the time of the crimes and was denied equal protection because the Legislature determined that forcible sex offenders such as defendant who are subject to indeterminate sentencing under the one strike law are not eligible for youth offender parole hearings and potential release after serving 25 years even though intentional first degree murderers are eligible for such hearings and release; (7) the sentence imposed constitutes cruel and unusual punishment; (8) we must remand to provide the trial court with an opportunity to exercise its newly-enacted discretion concerning whether to strike or dismiss defendant's prior serious felony juvenile adjudication under Penal Code section 667, subdivision (a)(1);[1] and (9) we must strike the five one-year terms imposed for defendant's prior prison terms under former section 667.5, subdivision (b), which has been amended since defendant's sentencing.

We conclude (1) the prosecution's use of a peremptory challenge on an African-American prospective juror did not violate defendant's constitutional rights; (2) the circumstances, including a post-jury-verdict disturbance in the courtroom involving defendant and others, justified closing the courtroom for the court trial on the prior conviction allegations; (3) the robbery convictions must be reversed because the thefts

---

[1] Undesignated statutory references are to the Penal Code.

were by false pretenses, not by larceny; (4) the evidence was sufficient that defendant committed assault with a deadly weapon when he whipped the victim with a thick belt and, as to the conviction for assault with force likely to cause great bodily injury, that conviction was not based on the use of a belt; (5) defendant forfeited consideration of his prosecutorial-misconduct contention because he did not object on that ground in the trial court, and trial counsel did not provide ineffective assistance of counsel; (6) defendant's equal protection contention is without merit because forcible sex offenders and intentional first degree murderers are not similarly situated and the Legislature had a rational basis for the unequal treatment; (7) defendant's sentence does not constitute cruel and unusual punishment; (8) we agree that remand is appropriate to provide the trial court with an opportunity to exercise its newly-enacted discretion concerning whether to strike or dismiss defendant's prior serious felony juvenile adjudication; and (9) we agree it is appropriate to strike the five one-year terms imposed under former section 667.5, subdivision (b).

We will modify the judgment to reverse the robbery convictions and strike the five one-year terms imposed under former section 667.5, subdivision (b), and affirm the judgment as modified. In addition, we will remand the matter to the trial court to exercise its newly-enacted discretion concerning whether to strike or dismiss defendant's prior serious felony juvenile adjudication under section 667, subdivision (a)(1).

BACKGROUND

Defendant met N.D.M. in person on April 1, 2016, and moved in with her on the same day. The relationship between N.D.M. and defendant lasted for three months. The first month was good, but the relationship was "terrible" thereafter. After they moved in together, N.D.M. revealed to defendant that she used to engage in prostitution before she met him. At the time, defendant didn't seem to react negatively. But, within a few weeks after they moved in together, defendant became enraged about N.D.M.'s past, demanded answers from her about items in the apartment, and assaulted her, pushing her

3

down and punching her in the chest and legs. After that, defendant began controlling N.D.M.'s appearance and hygiene.

Defendant beat N.D.M. daily in May 2016. He kicked, burned, punched, tased, whipped, and spit on N.D.M., which left her with bruises on her chest and arms. Defendant had a handgun on him at all times, and he pointed it at N.D.M.'s face. N.D.M. did not leave defendant because she was afraid he would come after her. Defendant monitored N.D.M.'s phone and had complete control over her life. When N.D.M. wanted to wear a short-sleeved blouse to work that would have revealed bruising on her arms from defendant's beatings, defendant would not let her. He had her call and quit her job.

After N.D.M. quit her job, defendant formulated a plan to make money by making N.D.M. offer herself for prostitution. The plan involved N.D.M. posting an ad on a website, and, upon meeting the customer, she was to trick him by taking the money and leaving. Defendant arranged for N.D.M. to video chat with him during these encounters to make sure she did not have sex with any of the customers.

When they were unsuccessful in getting anyone to respond to the website postings, defendant told N.D.M. that his ex-girlfriend A.R.B. would join them in their plan. Defendant told N.D.M. they would "use and abuse" A.R.B. A.R.B. moved in with them and began to argue with defendant.

Defendant's plan was to have both A.R.B. and N.D.M. show up for the appointments. One would distract the customer while the other took money and other valuables. The group went to several customers in Redding, Chico, and Stockton, which we recount in the discussion concerning the robbery counts.

Defendant also beat and whipped A.R.B., which produced deep, dark, purple welts and bruises. Most of the time, defendant was abusing one of the women.

Defendant became convinced that N.D.M. and A.R.B. were sleeping with each other behind his back, even though they were never out of his sight. Defendant was irate.

4

He forced N.D.M. to perform oral sex on A.R.B. twice on that day. After the second time, defendant also forced N.D.M. to perform oral sex on him.

In June 2016, N.D.M. tried to escape twice, but defendant physically prevented her from doing so. He also told her that, if the police ever showed up, he would kill her, the police, and himself.

A.R.B., who married defendant after his arrest, testified and denied that any of the abuse or crimes occurred.

A jury convicted defendant on five counts of forcible oral copulation (former § 288a, subd. (c)(2)(A); counts 5-9), three counts of corporal injury to a cohabitant (§ 273.5, subd. (a); counts 2, 10, 15), two counts of kidnapping (§ 207, subd. (a); counts 4, 11), two counts of robbery (§ 211; counts 16-17), one count of assault with a deadly weapon (§ 245, subd. (a)(1); count 1), and one count of assault with force likely to cause great bodily injury (§ 245, subd. (a)(4); count 3). The jury also found that, in committing the oral copulation, defendant committed the offense against more than one victim and kidnapped the victim, thus subjecting defendant to the one strike law. (§ 667.61, subd. (e)(1) & (4).)

The trial court found true allegations that defendant had a prior serious felony juvenile adjudication for firearm possession with an enhancement for street terrorism, subjecting defendant to the three strikes law (§§ 186.22; 667, subd. (a)(1); 1192.7, subd. (c)(28); 29820), and that defendant served a prior felony prison term (§ 667.5, subd. (b)).

The trial court sentenced defendant under the one strike law and the three strikes law to an aggregate determinate term of 50 years, plus an aggregate indeterminate term of 164-years-to-life.

Additional background is included in the discussion as relevant to the contentions on appeal.

DISCUSSION

I

Defendant contends the prosecution's use of a peremptory challenge on an African-American prospective juror violated his constitutional rights under *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69] (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).  Specifically, he argues (A) the trial court used the wrong standard in evaluating the prosecution's peremptory challenge, and (B) the prosecutor's reasons were pretextual.

"The United States and California Constitutions prohibit the discriminatory use of peremptory challenges.  (*Batson, supra,* 476 U.S. at p. 89; *Wheeler, supra*, 22 Cal.3d at pp. 276-277.)  A three-step inquiry governs the analysis of *Batson/Wheeler* claims.  'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  [Citation.]  Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes.  [Citations.]  Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." '  (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129], fn. omitted.)

 ' "The proper focus of a *Batson/Wheeler* inquiry, of course, is on the subjective genuineness of the race-neutral reasons given for the peremptory challenge, not on the objective reasonableness of those reasons. . . .  All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory." '  (*People v. O'Malley* (2016) 62 Cal.4th 944, 975 [italics omitted] (*O'Malley*).)  ' "At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.  Credibility can be measured by, among other factors, the

6

prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' " ' (*People v. Jones* (2011) 51 Cal.4th 346, 360 (*Jones*).)

' " ' "[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." ' " ' (*People v. Vines* (2011) 51 Cal.4th 830, 848.) However, ' "[w]hen the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." ' (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1171.)" (*People v. Miles* (2020) 9 Cal.5th 513, 538-539 (*Miles*).)

The defense's *Batson/Wheeler* motion was based on the prosecution's use of a peremptory challenge on prospective juror Alexandria Dunn. While there was some question about whether prospective juror Dunn was African-American, the court and counsel eventually proceeded as if she were. Defendant is African-American.

Prospective juror Dunn had a conviction for driving under the influence in 2011. She felt she was treated fairly. She had lived in Shasta County for two years, was a student of nursing at Shasta College, had no children, and lived with her significant other who was from Shasta County and worked in irrigation design and landscaping. She was sure she could be fair.

Defense counsel said to prospective jurors: "I don't mean to be overly dramatic, but we're talking about a pretty serious issue, talking about a history. You know, America has a history, right or wrong, and I think we all bring that -- we all bring opinions of that, one way or the other, and here -- I'm obviously worried about if you just can't get over a race or a tattoo or a combination issue, but the other end of the spectrum is, is that there's undue sympathy because of that history, that there's an overcorrection, right, the opposite end of the paradigm, so I'm looking for that. We just need to make

7

sure that we can be as just, basically, fair and push aside what we can as we move through this process." In response, prospective juror Dunn said: "I think I can be fair. I'm not -- I don't have any bias against tattoos or skin color. My boyfriend is covered, but in a more traditional way, and I feel a little sympathetic, because he's in this county and I feel that there's a lot of -- not racist people, but prejudice. [¶] And also, with the tattoos, a lot of people might think he looks like a criminal, but some people, especially my generation, might think he looks like a rapper, because it is a style. So -- "

Defense counsel commented that there were not many African-Americans in Shasta County, and prospective juror Dunn said: "I've never felt more like my skin color was an issue, even though I'm pretty fair, but I'm still -- I still have ethnic background, and that was pretty obvious, especially with my boyfriend, because he's a Caucasian and his whole family, they're -- they're from Oak Run and they're kind of very racist against me, even though I'm not dark, but they still see me as African-American, and they've used slurs that are really rude."

Defense counsel asked prospective juror Dunn whether she thought everyone in Shasta County was racist, and she responded: "No, not everybody. I mean, a lot of people immigrated here, but I think -- I'm not going to say -- I can't -- I can't speak for everybody. I don't know anybody here, so I don't know how anybody feels, but how I feel when I'm here is kind of uncomfortable, not here, but just in general, because it's obvious that I'm different to certain people. [¶] But, I have thought about this case, and I don't know what county you're from, I don't know if it's here, but I was also thinking about the females involved and, I mean, I don't -- I don't know their background or where they're from, but it's different, because the situation. Like, I'm in his generation." Prospective juror Dunn continued: "So I understand, like, the position that he's in and maybe his interests, or even the girls that he's with, they're all into the same thing, and so it's kind of hard to be -- it's kind of hard for me to pass judgment on that." Defense

8

counsel asked if prospective juror Dunn could put aside defendant's skin color and not be sympathetic with him on some level, and Dunn replied affirmatively.

Prospective juror Dunn agreed with defense counsel that there may be alternative lifestyles and the millennial generation involved in the case, and she responded affirmatively when defense counsel asked whether she could put aside skin color and gender issues in judging the case.

Returning to the issue prospective juror Dunn raised about the women involved in this case, she added that she would not necessarily have sympathy for them, observing that "everyone makes choices, and you can choose to hang out with somebody who does certain activities and that's their choice, and if you're involved in it, then, I mean, that's your choice. That was your choice." However, she said she could keep an open mind and not be biased.

Referring back to the question whether everyone "could be fair and impartial when listening to law enforcement testimony," the prosecutor noted prospective juror Dunn's body language at the time. Speaking to prospective juror Dunn, the prosecutor said, "You sort of smiled and you cocked your head and then you gave a hesitant yes to that." The prosecutor continued: "Now, I might have totally misread that. I think it was late in the afternoon when that happened, but if I didn't misread that, tell me where or what your thoughts are when asked, can you be fair and impartial when listening to a police officer testify." Prospective juror Dunn answered: "Uhm, I can be, because I -- I believe that if a police officer is testifying, that their job depends on honesty, so I think they can be fair."

The prosecutor also inquired further about prospective juror Dunn's response regarding "passing judgment on people within your own generation." Prospective juror Dunn said, "Well, it's more like sympathetic, because in my generation there's a bunch of types of people that do a bunch of different types of things and I understand their lifestyles, and it's kind of difficult for me to -- I mean, I'm not saying we have the same

9

lifestyles, but they might differ, I mean, I can put myself in that situation and understand what I would do, but it would be difficult for me to, like, tell him what he's doing is wrong with his life or what these women are doing is wrong with their life.  You know, it's kind of -- it's just different."  However, she told the prosecutor she could find the elements proved beyond a reasonable doubt if the prosecutor "did a good job and everything was presented."

Pressed further on the issue of judging people in her own generation, she said, "Uhm, it's just sympathy, because we're all -- we're just young and we make these very quick, rash decisions and it's just hard to, you know, throw away someone's life at such a young age like that based on the decisions they made, you know, in their 20's."  But prospective juror Dunn said potential punishment would not affect her decision.

The prosecutor asked prospective juror Dunn whether she would consider defendant's actions just the rash decisions of a 20-year-old, and prospective juror Dunn said, "Oh, no.  I mean, the severity of the allegations itself is pretty intense, but also at the same time, you know, I don't know.  It's hard to say.  I have sympathy, but I can't -- it's just how I feel at my age right now.  I mean, maybe when I'm 30 I'll definitely have a more formulated opinion on this type of situation, but it's just difficult for me."  She concluded:  "I just don't feel comfortable judging peers my own age."

In later questioning from the prosecutor on whether jurors had "preconceived notions about a person who remains with their abuser," prospective juror Dunn answered affirmatively.  She elaborated:  "Well, my mom and my sister are both -- they've always both have been in abusive relationships, but that's obviously something that they prefer and there is so many resources and they don't need to stay in those relationships, and I can get the reasons why, but you know, they don't have to stay in those relationships."  She added that the person's choice to stay in such a relationship would not affect her ability to judge credibility.

10

The prosecutor used a peremptory challenge to excuse prospective juror Dunn, and the defense immediately made a *Batson/Wheeler* motion.

The trial court recounted the three-step procedure for reviewing a *Batson/Wheeler* motion, including whether the defense made a prima facie showing of discriminatory use of peremptory challenge, the prosecutor's opportunity to state reasons if a prima facie case is presented, and the trial court's "determination as to whether the challenge was purposeful discrimination."

Defense counsel stated that prospective juror Dunn was the only African-American in the jury venire. She said she could be unbiased. Defendant is African-American. And one of the victims is white, like most of the jurors.

The trial court invited a response from the prosecutor but said that it was not making a finding that the defense had made a prima facie case.

The prosecutor gave the following response:

"Your honor, Ms. Dunn from her -- the very beginning, the demeanor that she exhibited and the body language when she asked, or the entire panel was asked, back in December if she could be fair and impartial when listening to law enforcement was hesitant, paused, and at one point during that very first questioning she smiled when the Court was asking the ability to be fair and impartial when listening to law enforcement testify.

"Then, yesterday she describes that she would feel sympathetic toward the defendant because this county has racist tendencies.

"Then, she indicated that she would have a hard time passing judgment on individuals within her own generation, and then she discussed as part of those concerns her concerns that the decision someone makes in their younger years -- she doesn't know the defendant's age, but she was supposing around her age -- would have lifelong consequences to that individual and those would be in her mind, although she could still be fair and impartial.

11

"She also made a comment, which defense counsel cut her off and she didn't finish even when I asked her about, that if a person makes choices to hang out with them, then they are choosing that, and then defense counsel cut her off when I tried to ask her more about that. She didn't finish that train of thought or comment.

"She also then said that she would not feel comfortable judging individuals within her millennial status or her age group.

"And, therefore, based on all of those reasons, the People chose to exercise a peremptory challenge because of the concerns about her bias or sympathy in her decision-making process.

"I would also note that we have two alleged victims in this case. One of those alleged victims does appear to be of a different racial background. That would be A.R.B., so the jury is not being left -- or a panel is not being left just with one victim who appears to be potentially the same race as the rest of them."

The trial court ruled as follows:

"I do find that there is -- there is not a reasonable inference that [prospective juror Dunn is] being challenged because of her membership in that group. So I -- I specifically find that a prima facie showing has not been made.

"She is the first challenge of any juror that might belong to that group and I -- I agree that there's -- this pool does not appear to include other people with African-American background, but I could be wrong about that.

"Out of an abundance of caution, I will add that even if a prima facie showing had been made, reviewing my notes, having listened to the questions posited by both sides, having observed the jurors' responses and demeanor, even if a prima facie case had been made, I would still find that there's a permissible basis for an exercise of a peremptory challenge.

12

"As against that particular juror, there are ample good-cause factors that have been cited by the People, which form a reasonable, nondiscriminatory basis for excusing that juror."

A

Defendant argues we should not defer to the trial court's ruling because the trial court used the wrong standard in the third stage of the *Batson/Wheeler* procedure and failed to make a "sincere and reasoned attempt to evaluate and determine if the reasons were subjectively credible."

Although the trial court said it had not made a finding regarding whether a prima facie showing had been made, it nevertheless proceeded to the second step by inviting the prosecutor to give reasons for the peremptory challenge. When the trial court proceeds to the second step, "we infer an 'implied prima facie finding' of discrimination and proceed directly to review of the ultimate question of purposeful discrimination." (*People v. Scott* (2015) 61 Cal.4th 363, 387, fn. 1.) In *People v. Chism* (2014) 58 Cal.4th 1266, the California Supreme Court stated: "Where the trial court determines that defendant did not make a prima facie showing of group bias and also rules on, indicates agreement or satisfaction with, or otherwise passes judgment on the ultimate question of purposeful discrimination, the case is described as a first stage/third stage *Batson*/*Wheeler* hybrid, and the question whether a defendant established a prima facie case of group bias is rendered moot." (*Id*. at p. 1314.) The Attorney General agrees with this approach.

" '[W]e must determine whether the trial court correctly ruled that the defense did not demonstrate discriminatory purpose at the third stage. The prosecutor's justification does not have to support a challenge for cause, and even a trivial reason, if genuine and race neutral, is sufficient. The inquiry is focused on whether the proffered neutral reasons are subjectively genuine, not on how objectively reasonable they are. The reasons need only be sincere and nondiscriminatory.' " (*People v. Hardy* (2018) 5 Cal.5th 56, 76, italics omitted (*Hardy*).) We review the trial court's determination with

restraint and defer to the trial court's ability to distinguish genuine reasons from sham excuses. (*Id.* at p. 76.)

Defendant argues the trial court erred in how it ruled on the *Batson/Wheeler* motion because it determined only that the prosecutor's reasons were objectively legitimate and reasonable, not that they were subjectively genuine. We disagree. Even though the trial court spoke of the legitimacy and reasonableness of the peremptory challenge, those are factors relevant to determining subjective genuineness. (*Jones, supra*, 51 Cal.4th at p. 360.) While the trial court here did not say the prosecutor's reasons for using a peremptory challenge on prospective juror Dunn were subjectively genuine, it stated reasons for such a finding.

We disagree with defendant that the trial court must state for the record its conclusion that the prosecutor's reasons were subjectively genuine when, as here, the trial court implicitly found the prosecutor's race-neutral explanations to be credible. (*Jones, supra*, 51 Cal.4th at p. 360.) For example, in *Miles*, the California Supreme Court recently held sufficient that the trial court found there were, in the trial court's words, "valid reasons to justify excusing those three prospective jurors pursuant to a peremptory challenge." (*Miles, supra*, 9 Cal.5th at p. 538.) There is no indication in *Miles* that the trial court used the wording of subjective genuineness, as defendant here argues is a requirement. While the Supreme Court did not say it was upholding the trial court's ruling on the *Batson/Wheeler* motion despite the trial court's failure to expressly state the standard it was applying, it nevertheless found the trial court's ruling sufficient. In other words, because the record shows the trial court engaged in the process of determining whether the prosecutor's reasons were subjectively genuine, defendant has failed to show error.

B

Although reasons for a prosecution peremptory challenge appear on the record, defendant argues "[t]he prosecutor's reasons were not genuine and were a pretext to

14

exclude the only Black juror." Defendant asserts (1) the prosecutor gave a laundry list of reasons for the peremptory challenge, (2) the prosecutor relied on prospective juror Dunn's demeanor, (3) prospective juror Dunn said she could be fair and impartial even though she implied a belief that Shasta County has racist tendencies, (4) the prosecutor failed to ask other young prospective jurors about judging others of their own generation, and (5) the prosecutor did not question prospective juror Dunn sufficiently about a person (such as the victims in this case) choosing to be with an abuser.

Defendant observes that the prosecutor gave several reasons for using the peremptory challenge. "A prosecutor's positing of multiple reasons, some of which, upon examination, prove implausible or unsupported by the facts, can in some circumstances fatally impair the prosecutor's credibility. [Citation.]" (*People v. Smith* (2018) 4 Cal.5th 1134, 1157-1158.) Here, however, the giving of several reasons did not impair the prosecution's credibility because none of the reasons were implausible or unsupported.

Defendant argues the prosecutor's statements about prospective juror Dunn's demeanor when asked whether she could be impartial when listening to law enforcement testimony lacks record support because prospective juror Dunn also said she had been treated fairly when she was arrested for driving under the influence and that she believed officers would testify truthfully because their jobs depended on honesty. But the prosecutor was not bound to believe prospective juror Dunn's statements when they may have been contradicted by her demeanor. (*People v. Panah* (2005) 35 Cal.4th 395, 441.)

Defendant asserts the prosecutor could not rely on prospective juror Dunn's implied belief that Shasta County residents who did not immigrate there were racist because prospective juror Dunn said she could set aside those feelings, because reliance on attitudes and beliefs of a group offends *Batson*, and because the prosecutor did not ask prospective juror Dunn about race. We disagree. We note that the prosecutor was not relying on the attitudes or beliefs of a group or merely assuming Dunn had those beliefs

15

because she is a member of the group; instead, she was relying on the attitudes and beliefs specifically expressed by prospective juror Dunn. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1015-1016; See also *People v. Avila* (2006) 38 Cal.4th 491, 545; *People v. Calvin* (2008) 159 Cal.App.4th 1377, 1384-1390.) And in response to defense counsel's question about feeling sympathy because of America's history involving race, Dunn said she felt "a little sympathetic" because defendant was in a county where, in her experience, there was racial prejudice.

Defendant further claims the prosecutor could not rely on prospective juror Dunn's difficulty in judging people her own age because the prosecutor did not ask other young prospective jurors how they felt about judging someone their age. According to defendant, this is a comparative juror analysis that highlights the implausibility of the prosecutor's reasons. (See *Hardy, supra*, 5 Cal.5th at p. 115 [comparative juror analysis may show pretext].) But the difficulty in judging people her own age is something prospective juror Dunn raised herself before the prosecutor pursued the issue with her. None of the other jurors raised any qualms about judging people their own age, so there was no reason for the prosecutor to pursue the issue with them. In other words, a comparative analysis here does not support a finding of pretext.

Finally, defendant asserts the prosecution's reliance on prospective juror Dunn's statements about victims choosing to stay with the abuser was unwarranted because the prosecutor did not question prospective juror Dunn sufficiently about her attitude in this regard. In other words, defendant claims the lack of further questioning showed that reliance on prospective juror Dunn's attitude was a pretext. But the trial court was not required to draw that inference from the prosecutor's limited questioning on the topic.

Each of defendant's arguments that the prosecutor's reasons for the peremptory challenge were pretextual is without merit.

16

After a post-jury-verdict disturbance in the courtroom involving defendant and others, the trial court closed the courtroom for the court trial on the prior conviction allegations. Defendant contends the trial court erred by closing the courtroom for that court trial.

During closing argument, the prosecutor said: "[Defendant's mother], who seems like otherwise a very nice person, other than the fact that her son is here charged with crimes, she didn't see that bruise to [N.D.M.'s] arm." Apparently responding to this statement, defendant interjected: "Don't be saying about my momma." After the jury reached its verdicts and was excused, the trial court began the court trial on the prior conviction allegations. At that point, the record indicates that defendant, his trial counsel, and the bailiff had an off-the-record discussion that erupted onto the record, as follows:

"THE DEFENDANT: Shut the fuck up talking to me. I'll go fuck you up.

"THE BAILIFF: Clear the courtroom. Clear the courtroom.

"THE DEFENDANT: I want to talk to my mom.

"THE BAILIFF: Mr. Boston, sit down.

"THE DEFENDANT: I love you, mom. I love you, mom.

"THE BAILIFF: Sit down. Sit down.

"FEMALE IN AUDIENCE: Don't do that.

"THE DEFENDANT: My mom.

"FEMALE IN AUDIENCE: Stevie, stop.

"FEMALE IN AUDIENCE: Please don't do that to my baby. Don't do that to him. He's hurt."

The judge, clerk, and court reporter left the courtroom.

After a recess, the trial court stated for the record what had happened: "What may not be clear on the record is we took a significant break. There was a rather substantial

disturbance during the course of the proceedings and we had to take a break, and I should probably try to put that on the record so we have a clear record.

"So after we released the jury and as we were discussing enhancements, there was a great deal of drama in the courtroom and it's -- that included some yelling and screaming and, from what I observed, the defendant becoming physically upset and disruptive and not following the marshal's instructions.

"And the Court, seeing that things had completely deteriorated, and seeing that there was some difficulty in having the defendant restrained, activated the emergency system, and other marshals came into the courtroom and that was, gosh, probably 45 minutes ago.

"And I've had a chance to confer with counsel, and it appears to me as though the defendant's had a chance to calm down, and when I was conferring with counsel in the -- in my chambers, we collectively thought that it might be a good idea if instead of completing the enhancement stage of the proceedings today, when the defendant is so upset, that we maybe do that at a different time that's convenient with all counsel, and that would give the defendant and, really, everyone, a chance to catch their breath and reflect a little bit more and have a more dignified and -- proceeding about these important matters."

Defense counsel indicated to the trial court that it was important to defendant to have his mother present. The trial court said that it would confer with security personnel before the next proceeding.

Two weeks later, the trial court reconvened in this case, and the trial court put on the record additional details of what had happened two weeks earlier: "[A] donnybrook broke out in the courtroom, people screaming, yelling. The defendant failed to obey commands from the marshals. He was held down against the table until the courtroom was cleared. The conflict spilled out into the hallway of the courthouse. Several

18

emergency alarms were activated. Marshals came from all kinds of other departments. Obviously, a very substantial security risk.

"At least one arrest was made, I learned, and the judge and the clerk exited the courtroom as the fracas was taking place. So in a commitment to not let that happen again, I've undertaken to finish the remainder of this trial here in Department 1, which is part of the jail facility building; much more secure environment.

"The defendant appears -- is restrained, and I have closed the session to complete this portion of the session."

The defense objected to closing the courtroom and specifically objected to excluding defendant's mother. Defense counsel said: "I understand the Court's concerns about what happened at the last setting. I was present for that. I think there's a little more context to it, but it wasn't necessarily [defendant] who was the catalyst. I believe there was some issues with who was in the public forum. If there could be a narrower -- narrowing of that to allow [defendant's] mother to be present and no others, that would be my request."

The trial court responded that it was closing the courtroom for everyone's safety, including defendant's. The trial court continued: "[I]t appeared to me at the trial that there were -- for lack of a better way to put it, there were pro-defendant and anti-defendant forces in the gallery. That obviously did not mix well."

The trial court concluded that, for security reasons, it would close the courtroom for what it considered a "de minimis part of the overall trial." The trial court then proceeded to a hearing on the necessity of having defendant restrained during the trial on the prior convictions, which included evidence relevant to, and a discussion of, closing the courtroom.

The bailiff testified concerning what occurred two weeks earlier. He said that, after the verdict was rendered, defendant, who had previously been relaxed, became rigid and moved to a position in which a person would rise from the chair. He put his head on

his hands and said, "no" several times. He also stared at the bailiff and looked back into the gallery and said, "I love you, Mom," or "I love you, Mama." The bailiff approached defendant and asked him to face forward and not address the public. Defendant again said, "I love you, Mama." The bailiff put his hand on defendant's shoulder and again asked him to face forward. Defendant told the bailiff not to touch him, a female yelled, "stop," and the disruption escalated. The bailiff also testified that after the prior proceeding, defendant caused a disturbance at the jail by refusing to end a phone call and return to his cell. Defendant had also caused other previous disruptions at the jail.

Defense counsel did not object to shackling defendant, but he objected to closing the courtroom and, specifically, excluding defendant's mother. The prosecutor noted that defendant's mother had an active role in the prior disruption in the courtroom. The trial court agreed, and determined the courtroom would be closed for the court trial on the prior conviction allegations. The trial court then took evidence and found the prior conviction allegations true.

A criminal defendant has a right to a public trial that is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by article 1, section 15 of the California Constitution. (*Waller v. Georgia* (1984) 467 U.S. 39, 46 [81 L.Ed.2d 31] (*Waller*); *People v. Woodward* (1992) 4 Cal.4th 376, 382.) "[A]n accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged." (*In re Oliver* (1948) 333 U.S. 257, 272 [92 L.Ed. 682].) "Violation of this right requires reversal of the judgment without examination of possible prejudice. [Citation.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1276.) However, the right to a public trial is not absolute.

"[T]he right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information. . . . [¶] 'The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to

preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.' " (*Waller, supra,* 467 U.S. at p. 45; see *Presley v. Georgia* (2010) 558 U.S. 209, 213 [175 L.Ed.2d 675] (*Presley*); accord, *People v. Virgil* (2011) 51 Cal.4th 1210, 1237 (*Virgil*).)

"Trial courts retain broad power to control their courtrooms to maintain security, protect the defendant's interest in a fair trial, protect the privacy concerns of prospective jurors, and efficiently dispose of matters outside the hearing of jurors or testifying witnesses. [Citations.] We have also held that even a partial or temporary exclusion of the public from certain proceedings, if justified, imposes no more than a de minimis restriction on the constitutional right to a public trial." (*Virgil, supra,* 51 Cal.4th at p. 1237.) Nevertheless, "[t]he exclusion of any nondisruptive spectator from a criminal trial should never be undertaken without a full evaluation of the necessity for the exclusion and the alternatives that might be taken. This evaluation should be reflected in the record of the proceedings. The evaluation would fulfill the statutory requirements, if any, for exclusion of persons from a trial and assist in the evaluation of any alleged constitutional violation." (*People v. Esquibel* (2008) 166 Cal.App.4th 539, 556.)

Therefore, to justify closure of a trial, four criteria must be considered: (1) there must be "an overriding interest that is likely to be prejudiced"; (2) the closure must be narrowly tailored, that is, "no broader than necessary to protect that interest"; (3) "the trial court must consider reasonable alternatives to closing the proceeding"; and (4) the trial court "must make findings adequate to support the closure" to allow a reviewing court to determine whether the closure was proper. (*Waller, supra*, 467 U.S. at p. 48.)

Applying these criteria to this case, we conclude the trial court did not violate defendant's right to a public trial when it closed the courtroom for the court trial on the prior conviction allegations. Concerning the trial court's overriding interest in security

and order, defendant acknowledges the existence of the overriding interest under the circumstances.

Defendant argues the order was not narrowly tailored because defendant could be shackled and because two weeks had passed since the incident. But defendant's conduct was only part of the concern, and the trial court was not required to conclude that, with defendant's mother present, as well as opposing individuals, there would have been no repeat (or worse) of the incident. The trial court observed much of the prior incident and was informed concerning the remainder of the incident, including the disturbance and arrest in the hallway. We cannot say it was unreasonable or unjustified to conclude there was a significant possibility of further problems.

For the same reasons, we conclude the trial court adequately considered alternatives. The trial court held a hearing on the matter, in which different proposals were considered, including shackling defendant and excluding everyone except his mother. It is not apparent to us that, given defendant's conduct, his family's conduct, and the presence of opposing individuals, it was unreasonable to close the courtroom.

The trial court also made adequate findings for us to review the closure of the courtroom. The trial court conferred with security personnel. There is no dispute concerning what happened or that what happened involved a significant security risk. The trial court heard argument concerning alternatives and decided that it was necessary to close the courtroom.

Defendant claims *Presley, supra*, 558 U.S. 209 is directly on point. In that case, the trial court excluded the public, including the defendant's relatives, during jury voir dire because of space limitations and so that prospective jurors would not overhear conversations potentially prejudicial to the defendant. The United States Supreme Court held that the exclusion of the relative from the courtroom violated the defendant's right to a public trial because the trial court did not consider reasonable alternatives to excluding the relative. (*Id.* at p. 216.) We disagree that *Presley* is on point. Here, the trial court did

a significant amount of investigation and concluded that the disturbance went well beyond just defendant's conduct. It considered defendant's objections to excluding defendant's mother from the courtroom and ultimately decided not to allow defendant's mother or others to be in the courtroom during the court trial on the prior conviction allegations for security reasons. Defendant's suggestions on appeal that defendant could have been shackled (as he was in any event) and instructions could have been given to defendant's mother do not represent a reasonable alternative given the prior conduct of defendant, defendant's mother, and others in the courtroom and hallway.

Given the significant security risk, the trial court's closure of the courtroom for the court trial on the prior conviction allegations did not violate defendant's right to a public trial. We therefore need not determine whether the closure of the courtroom was de minimis under authority holding that, under some circumstances, a brief exclusion of the public does not violate a defendant's right to a public trial. (See *People v. Bui* (2010) 183 Cal.App.4th 675, 688-689 [exclusion of three individuals from courtroom for very limited time was not a violation of right to public trial].)

III

Defendant contends, and the Attorney General agrees, defendant's convictions on two counts of robbery (counts 16 and 17) must be reversed because the thefts were by false pretenses, not by larceny.

"Robbery is defined as 'the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.' (Pen. Code, § 211.)" (*People v. Anderson* (2011) 51 Cal.4th 989, 994.) Larceny is required for robbery. Theft by false pretenses is insufficient. (*People v. Williams* (2013) 57 Cal.4th 776, 786 (*Williams*).) Larceny is a taking without the owner's consent, while theft by false pretenses involves a consensual transfer by the owner. (*Id.* at pp. 788-789.)

In *Williams*, the defendant committed theft by false pretenses by purchasing gift cards with a fraudulent credit card. On his way out of the store, he pushed a security guard who confronted him. (*Williams, supra*, 57 Cal.4th at p. 780.) The California Supreme Court concluded that, because the store employee consented to transferring title to the gift card to the defendant, the crime was theft by false pretenses, not larceny, and, therefore, the defendant did not commit robbery, even if he pushed the security guard on his way out of the store. (*Id.* at p. 788.)

Here, as will be seen, the prosecution presented evidence of five incidents of takings in which N.D.M. or A.R.B. arranged to provide sex to a customer for money and took the money without providing sex. The trial court gave the jury a unanimity instruction. The customers willingly gave the money to the women, expecting to receive what the women did not intend to give. In other words, the victims consented to the women taking the money at the time the money was given. That is theft by false pretenses, not larceny.

In downtown Redding, N.D.M. and A.R.B. arranged to meet a customer for sex. The women went inside while defendant waited in the car. The customer gave the women the money, and N.D.M. said she needed to return to the car for a condom. Both women left and gave the money to defendant.

At a truck stop in Redding, defendant and A.R.B. waited in the car while N.D.M. went to a customer's truck. The customer gave N.D.M. money, and N.D.M. asked the customer to buy her a soda. While the customer was in the store at the truck stop, N.D.M. left with defendant and A.R.B.

At a hotel in Chico, a customer came to a room. N.D.M., A.R.B., and defendant were in the room. When the customer arrived, defendant hid in the closet. The customer gave some of the money to the women. The women and the customer began arguing about the rest of the money. Defendant came out of the closet and told the customer to leave. The customer left.

24

At an apartment complex in Chico, N.D.M. went upstairs to a customer's apartment while A.R.B. and defendant waited. The customer gave N.D.M. the money. N.D.M. tried to leave, but the customer prevented her from leaving. N.D.M. pulled out a taser, and the customer let her leave.

In Stockton, A.R.B. and N.D.M. went into a customer's residence. The customer gave the women the money. When the women began to leave, the customer was not happy and wanted his money back. The customer followed the women to the car, where defendant got out of the car with a gun. The customer walked away, and N.D.M., A.R.B., and defendant drove away.

In each instance, the customer willingly gave the money to the women believing the customer was purchasing sex. Therefore, the takings were thefts by false pretenses, not larceny. Because the takings were thefts by false pretenses, which does not have an asportation element, the crimes were complete and ended when the money was transferred, notwithstanding the later application of force or fear in a couple of the instances. In other words, the crimes were not robbery. (*Williams, supra*, 57 Cal.4th at p. 780.) Therefore, defendant and the Attorney General are correct that defendant's convictions for robbery (counts 16 and 17) must be reversed.

IV

Defendant contends the convictions for assault with a deadly weapon (count 1; § 245, subd. (a)(1)) and assault by of force likely to cause great bodily injury (count 3; § 245, subd. (a)(4)) must be reversed because there was insufficient evidence defendant used a belt as a deadly weapon or in a manner likely to produce death or great bodily injury.

"On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt. [Citations.] Evidence meeting this standard satisfies constitutional due process and reliability concerns. [Citations.] [¶]

25

While the appellate court must determine that the supporting evidence is reasonable, inherently credible, and of solid value, the court must review the evidence in the light most favorable to the [judgment], and must presume every fact the jury could reasonably have deduced from the evidence." (*People v. Boyer* (2006) 38 Cal.4th 412, 479-480.)

*Count 1*

"As used in section 245, subdivision (a)(1), a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' [Citation.] Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. [Citation.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury. In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue. [Citations.]" (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1029 (*Aguilar*); see *In re David V.* (2010) 48 Cal.4th 23, 30, fn. 5.)

Objects found to be deadly weapons include a pencil (*People v. Page* (2004) 123 Cal.App.4th 1466, 1472), an apple with an embedded straight pin (*In re Jose R.* (1982) 137 Cal.App.3d 269, 273, 277), and steel-toed boots (*Aguilar, supra,* 16 Cal.4th at p. 1035). Great bodily injury is significant or substantial bodily injury. (*People v. Beasley* (2003) 105 Cal.App.4th 1078, 1087.) While death or great bodily injury must be likely, it need not actually occur. (*People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1065.) Bruising may constitute a significant or substantial bodily injury. (*People v. Escobar* (1992) 3 Cal.4th 740, 752.) And "the inquiry focuses on 'the force actually used,' not 'the force that . . . could have [been] used.' " (*In re B.M.* (2018) 6 Cal.5th 528, 534, italics omitted.) The trial court properly instructed the jury on all these elements.

N.D.M. testified defendant whipped her with a thick leather belt "all the time." He struck her only below the neck so she could be presentable in public by covering up the injuries. He did not hit her with the buckle end of the belt. During N.D.M.'s testimony, the belt was introduced into evidence. While N.D.M. did not testify specifically about which injuries defendant inflicted using the belt, witnesses observed extensive bruising on N.D.M.'s body.

Defendant claims there was no evidence of the injuries inflicted with the belt; however, the jury could reasonably infer from the testimony concerning defendant whipping N.D.M. with the belt "all the time" and testimony that there was extensive bruising on N.D.M.'s body, that at least some of the bruising resulted from the use of the belt.

Reasonable jurors could also infer that the thick belt, when used to whip N.D.M., was likely to produce a significant or substantial bodily injury. Furthermore, even though N.D.M. did not testify concerning which specific injuries were inflicted by the belt, such testimony was not needed for the conviction because actual injury is not required to sustain the conviction for assault with a deadly weapon. And, in any event, the jury could reasonably infer that at least some of the numerous bruises on N.D.M. were caused by the belt. Accordingly, the evidence was sufficient to support a jury determination that defendant used the belt in a manner likely to produce great bodily injury (that is, bruising), which means the evidence was sufficient to find defendant guilty of assault with a deadly weapon as charged in count 1.

*Count 3*

Concerning count 3, assault with force likely to inflict great bodily injury, defendant makes no argument separate from the argument as to count 1, assault with a deadly weapon (a belt). Defendant notes that the trial court stayed the sentence on count 3 and claims that the charge in count 3 was based on the same conduct as count 1. But that is not how count 3 was presented in the trial court. The prosecutor argued that count

27

3 was based on defendant's first attack on N.D.M. when he knocked her to the ground, hitting her so hard in the chest that it caused her chest to hurt. The prosecutor did not mention use of a belt in connection with count 3.

The Attorney General makes the point in the respondent's brief that count 3 was not based on use of a belt, and defendant does not broach the issue in the reply brief. Therefore, because defendant's sufficiency of the evidence argument with respect to count 3 discusses only the use of the belt, and count 3 was not based on use of a belt, defendant's argument lacks merit.

V

Defendant contends the prosecutor committed prejudicial misconduct by asking a witness (A.R.B.) questions on cross-examination about whether she considered invoking her privilege against self-incrimination. Defendant further contends that, if defendant forfeited consideration of the issue on appeal by failing to object, his trial counsel provided ineffective assistance of counsel.

"If in the instant proceeding or on a prior occasion a privilege is or was exercised not to testify with respect to any matter, or to refuse to disclose or to prevent another from disclosing any matter, neither the presiding officer nor counsel may comment thereon, no presumption shall arise because of the exercise of the privilege, and the trier of fact may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding." (Evid. Code, § 913, subd. (a).) Compelling a witness to assert a Fifth Amendment privilege in front of the jury may constitute reversible error because the jury may draw improper and speculative inferences from the assertion of the privilege, adding weight to the prosecution's case. (*Namet v. United States* (1963) 373 U.S. 179, 186-187 [10 L.Ed.2d 278]; *People v. Mincey* (1992) 2 Cal.4th 408, 442.)

The prosecutor's relevant cross-examination of A.R.B. was as follows:

"Q  And isn't it true before the preliminary hearing you did talk with the defense attorney named Aaron Williams about whether or not you were going to invoke your Fifth Amendment right to remain silent?

"[Defense counsel]:  Privileged.  Object.

"THE COURT:  Sustained.

"[Prosecutor]:  Isn't it true that you spoke with the defense attorney appointed for you by the Court prior to the preliminary hearing?

"[Defense counsel]:  That privileged as well.

"THE COURT:  Sustained.

"THE WITNESS:  They had assigned me the --

"THE COURT:  No.  No.  I sustained the objection.  You don't need to respond.

"THE WITNESS:  Oh, okay.

"[Prosecutor]:  Isn't it true that you told the Court you wouldn't invoke your Fifth Amendment right, because you weren't admitting to any crimes at the preliminary hearing?

"A     No, I don't remember saying that.

"Q     Isn't it true Mr. Williams told the court that?

"A     No, not that I recall.

"Q     And the only time a person would need immunity is if they're getting on the stand and admitting to crimes still within the statute of limitations?

"A     Well, there was no crime committed, so I don't know why we need to do that, why that's necessary.

"Q     Because you're not admitting any crimes on the stand; correct?

"A     Because there was never any crimes committed.  If there was, yes, I would admit to that.

"Q     So you were talked to about immunity prior to the preliminary hearing, correct?

29

"[Defense counsel]:  Same objection.

"THE COURT:  Well, to the extent you had any communications with attorneys that were appointed for you or representing you, you're not required to respond to any of those questions.

"This question's broader.  If there were others, like the prosecution, for example, that talked to you about immunity, you can respond to that question.

"THE WITNESS:  Okay.  Well, I don't remember him talking about immunity, but I think he was just letting me know, like, my rights and stuff and that was it."

As the California Supreme Court has explained, "[i]t is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal.  [Citations.]  'The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice.'  [Citation.]"  (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328.)

Here, defendant did not make a specific objection of prosecutorial misconduct and did not request the jury be admonished.  Therefore, he forfeited consideration of the prosecutorial-misconduct issue on appeal.  Defendant asserts he objected to the questioning, but the objection was based on privilege, not on prosecutorial misconduct. The assertion therefore fails.

Defendant further contends that, if trial counsel did not preserve the prosecutorial misconduct issue, trial counsel provided ineffective assistance of counsel.  "To succeed in a claim of ineffective assistance of counsel, defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and that, but for counsel's error, the outcome of the proceeding, to a reasonable probability, would have been different.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694 [80 L.Ed.2d 674]; *People v. Ledesma* (1987) 43 Cal.3d

171, 216-218.)" (*People v. Lawley* (2002) 27 Cal.4th 102, 133, fn. 9.) It is not necessary for the reviewing court to examine the performance prong of the test before examining whether the defendant suffered prejudice as a result of counsel's alleged deficiencies. (*Strickland v. Washington, supra,* 466 U.S. at p. 697.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (*Ibid.*)

Here, it is not reasonably probable defendant would have obtained a more favorable result if his trial counsel had preserved the prosecutorial-misconduct issue for appeal. A.R.B.'s answers to the prosecutor's questions about invoking her privilege against self-incrimination revealed that she did not invoke that privilege because she believed no crime had been committed. In other words, the prejudicial aspect of inquiring whether the privilege had been invoked, such as the jury drawing an inference from the invocation, was not present here. There was no inference to be drawn by the jury that A.R.B. was hiding something or believed a crime had been committed. Additionally, the trial court sustained the objection to the question about whether A.R.B. invoked the privilege, a signal to the jury not to consider it. Finally, even assuming the questions concerning invoking the privilege against self-incrimination were improper, the prosecutor's inquiry into whether A.R.B. had been offered or given immunity for her testimony was proper. (See *People v. Frye* (1998) 18 Cal.4th 894, 971 [grant of immunity properly revealed to jury], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Defendant argues the questioning concerning whether A.R.B. considered invoking her privilege against self-incrimination was prejudicial because this case involved a credibility contest between A.R.B. and N.D.M. The argument is unavailing, however, because defendant fails to establish on this record any probability that the jury based its credibility determinations, even in part, on whether A.R.B. considered invoking her

privilege against self-incrimination.  Therefore, defendant's contention of ineffective assistance of counsel fails on the prejudice analysis.

VI

Defendant, who was 20 years old when he committed the crimes, contends he was denied equal protection because the Legislature determined that forcible sex offenders such as defendant who are subject to indeterminate sentencing under the one strike law are not eligible for youth offender parole hearings and potential release after serving 25 years even though intentional first degree murderers are eligible for such hearings and release.

Section 667.61, known as the one strike law, provides "an alternative, harsher sentencing scheme for certain forcible sex crimes."  (*People v. Mancebo* (2002) 27 Cal.4th 735, 738.)  "Section 667.61 requires the trial court to impose a life sentence when the defendant is convicted of an enumerated sexual offense [under subdivision (c)] and the People plead and prove one or more of the specified aggravating circumstances. [Citations.]  When the People prove a single circumstance listed under section 667.61, subdivision (d) or at least [two] of the circumstances listed under subdivision (e), the term is 25 years to life; when only a single circumstance under subdivision (e) is proved, the term is 15 years to life."  (*People v. DeSimone* (1998) 62 Cal.App.4th 693, 696-697.)

The one strike law applies to defendant because he kidnapped the victim of forcible oral copulation (N.D.M.) (§ 667.61, subd. (e)(1)) and he committed the sex offenses against more than one victim (§ 667.61, subd. (e)(4)).  Defendant was sentenced under the one strike law on counts 5 through 8 (all counts alleging oral copulation under former section 288a) to consecutive indeterminate terms.  On count 5, he was sentenced to 50 years to life (25 years to life under the one strike law, doubled to 50 years to life under the three strikes law).  On each of counts 6 through 8, he was sentenced to consecutive terms of 30 years to life (15 years to life under the one strike law, doubled to

32

30 years to life under the three strikes law), for a total indeterminate term of 140 years for these counts.

Given his long indeterminate sentence under the one strike law, defendant contends he is denied equal protection because he is not eligible for a youth offender parole hearing and possible release after 25 years of incarceration while a person his age who commits intentional first degree murder is eligible for a youth offender parole hearing and possible release under section 3051 after 25 years of incarceration.

Under section 3051, subdivisions (a) and (b), offenders 25 years of age and younger at the time of their offense are eligible for a youth offender parole hearing after 15, 20, or 25 years in prison, depending on the sentence. (§ 3051, subds. (a)-(b).) However, section 3051, subdivision (h) provides a carve-out provision that excludes from the other provisions of section 3051 those offenders who are adults (18 or over) when they committed their crime *and* are subject to sentencing under the three strikes law or the one strike law.[2] Defendant contends this carve-out provision violates constitutional equal protection guarantees.

The districts of the Court of Appeal are split on this equal protection issue. (See *People v. Edwards* (2019) 34 Cal.App.5th 183, 192-199 (*Edwards*) [First App. Dist., Div. Four], finding an equal protection violation; *People v. Williams* (2020) 47 Cal.App.5th 475, 488-493, review granted July 22, 2020, S262191 [Fourth App. Dist., Div. One], not finding an equal protection violation.)[3]

---

[2] Subdivision (h) of section 3051 provides: "This section shall not apply to cases in which sentencing occurs pursuant to Section 1170.12, subdivisions (b) to (i), inclusive, of Section 667, or Section 667.61, or to cases in which an individual is sentenced to life in prison without the possibility of parole for a controlling offense that was committed after the person had attained 18 years of age."

[3] See also *People v. Bell* (2016) 3 Cal.App.5th 865 (*Bell*), petition for review granted and case transferred back to Court of Appeal [Second App. Dist., Div. Eight; no equal

The Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution guarantee equal protection of the laws. To establish an equal protection violation, a party must show that the state adopted a classification that affects two similarly situated groups in an unequal manner. (*People v. Wilkinson* (2004) 33 Cal.4th 821, 836; *Edwards, supra,* 34 Cal.App.5th at p. 195.) If a class of criminal defendants is similarly situated to another class of criminal defendants, and the two classes are sentenced differently, we must determine whether there is a rational basis for the difference. (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 882; *Edwards,* at p. 195.)

In *Edwards*, the defendants, who were 19 years old at the time, committed robbery and sexual assault of a woman and robbery of her male friend. (*Edwards, supra*, 34 Cal.App.5th at p. 186.) The defendants were sentenced under the one strike law to 25 years or more to life because one defendant or both, while committing the sexual assault and the accompanying robberies, personally inflicted great bodily injury and personally used a firearm. (§ 667.61, subds. (d)(6), (e)(3) & (7); *Edwards*, at p. 189.) On appeal, the court held that the carve-out provision of the one strike law, which had the effect of disqualifying the defendants for a youth offender parole hearing and possible release after 25 years of incarceration, violated the defendants' equal protection rights because intentional first degree murderers are eligible for the hearing and possible release. (*Edwards*, at p. 197.) We disagree with the holding in *Edwards*. (See *People v.*

---

protection violation].) The court in *Williams* described the unusual procedural posture in *Bell*: "Review granted on other grounds [that is, other than the equal protection issue] on January 11, 2017, S238339, vacated, and transferred on June 13, 2018, in light of [*People v. Contreras* (2018) 4 Cal.5th 349]. Noting this was the most recent of six appeals it had decided following the defendant's convictions for crimes he committed in 2000 when he was 14 years old, the Second District in *People v. Bell* (Aug. 2, 2018, B263022) (nonpub. opn.) remanded the matter for the trial court to consider and apply the '*Contreras* factors' in resentencing the defendant. (*Ibid*.)" (*People v. Williams, supra,* 47 Cal.App.5th at p. 491, fn. 18, review granted.)

*Williams, supra*, 47 Cal.App.5th at pp. 488-493, review granted [Legislature had a rational basis for disparate treatment].)

Section 3051 was enacted in response to the California Supreme Court's decision in *People v. Caballero* (2012) 55 Cal.4th 262, which held that sentencing a defendant who committed nonhomicide crimes as a juvenile to the functional equivalent of life without possibility of parole constituted cruel and unusual punishment. The Legislature's solution, among other things, was to give juvenile defendants a youth offender parole hearing and possible release after 25 years of incarceration. (*People v. Contreras* (2018) 4 Cal.5th 349, 381 (*Contreras*).) However, the Legislature went beyond a response to *Caballero* by extending the youth parole hearing and possible release to juveniles who commit homicide crimes and also, eventually, to adult offenders who were 18 to 25 years old at the time of the crimes. (§ 3051, subd. (b).)

*Edwards* finds the carve-out provision of section 3051 unconstitutional, stating that, "while a sentencing scheme can rationally express the public's distaste for sex offenders, it cannot limit their opportunity for eventual parole more harshly than it limits those who commit intentional first degree murder." (*Edwards, supra*, 34 Cal.App.5th at p. 195.) We conclude the *Edwards* rationale suffers on both prongs of the equal protection test.

Although the court in *Edwards* determined that forcible sex offenders and intentional first degree murderers are similarly situated for purposes of section 3051 (*Edwards, supra*, 34 Cal.App.5th at p. 195), the Legislature expressly excluded from the benefits of section 3051 defendants who are subject to the three strikes law and, as here, those who are subject to the one strike law. (§ 3051, subd. (h).) Generally, persons who commit different crimes are not similarly situated. (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1199 (*Hofsheier*).)

It is true that the Equal Protection Clause " 'imposes a requirement of some rationality in the nature of the class singled out.' (*Rinaldi v. Yeager* (1966) 384 U.S. 305,

308-309 [16 L.Ed.2d 577]; see *People v. Nguyen* (1997) 54 Cal.App.4th 705, 714.) Otherwise, the state could arbitrarily discriminate between similarly situated persons simply by classifying their conduct under different criminal statutes. (See *Lawrence v. Texas* (2003) 539 U.S. 558, 582 [156 L.Ed.2d 508] (conc. opn. of O'Connor, J.).)" (*Hofsheier, supra*, 37 Cal.4th at p. 1199.) Thus, in *Hofsheier*, the California Supreme Court concluded that persons who committed oral copulation on a minor (former § 280a, subd. (b)) and persons who committed unlawful sexual intercourse with a minor (§ 261.5) were similarly situated because "[t]he only difference between the two offenses is the nature of the sexual act." (*Hofsheier, supra*, at p. 1200.) But the crimes being compared here are much more distinct than the crimes compared in *Hofsheier*. And the Legislature could rationally conclude that forcible sex offenders are sufficiently different that they should be treated differently. Because this is so, we decline here to substitute our judgment for the judgment of the Legislature.

Certainly, forcible sex offenders and intentional first degree murderers are different. They have committed categorically different crimes, and they are subject to different propensities. Also, their potential victims are different should the offender decide to recidivate. It was not irrational for the Legislature to determine that, because of the nature of the offense and the offender and the vulnerability of the victims relating to forcible sex offenses, convicted forcible sex offenders should be treated differently. Therefore, because forcible sex offenders and intentional first degree murderers are not similarly situated, defendant's equal protection challenge fails.

Even if we were to assume that forcible sex offenders and intentional first degree murderers were similarly situated, defendant's equal protection challenge also fails on the rational relationship test. The question the rational relationship test asks is whether "the challenged classification bears a rational relationship to a legitimate state purpose." (*Hofsheier, supra*, 37 Cal.4th at p. 1200.) *Edwards* reasons that because murder is more depraved than rape, rape cannot be punished more harshly than murder. (*Edwards,*

36

*supra*, 34 Cal.App.5th at pp. 196-197.)  But rule 4.410 of the California Rules of Court recognizes eight general objectives of sentencing, of which punishment is only one. Rule 4.410(a) states:

"General objectives of sentencing include:

"(1)  Protecting society;

"(2)  Punishing the defendant;

"(3)  Encouraging the defendant to lead a law-abiding life in the future and deterring him or her from future offenses;

"(4)  Deterring others from criminal conduct by demonstrating its consequences;

"(5)  Preventing the defendant from committing new crimes by isolating him or her for the period of incarceration;

"(6)  Securing restitution for the victims of crime;

"(7)  Achieving uniformity in sentencing; and

"(8)  Increasing public safety by reducing recidivism through community-based corrections programs and evidence-based practices."

These sentencing objectives represent legitimate state interests, and show that punishment is not the only consideration.  Based on those factors, it was not unreasonable for the Legislature to conclude that forcible sex offenders require different treatment. "This standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve.  Nor must the underlying rationale be empirically substantiated. [Citation.]  While the realities of the subject matter cannot be completely ignored [citation], a court may engage in ' "rational speculation" ' as to the justifications for the legislative choice [citation].  It is immaterial for rational basis review 'whether or not' any such speculation has 'a foundation in the record.' " (*People v. Turnage* (2012) 55 Cal.4th 62, 74-75 (*Turnage*), quoted in *Edwards, supra*, 34 Cal.App.5th at p. 195.)

To prevail on a claim that the disparate treatment violates the rational relationship test, a party must " 'negative every conceivable basis' " that might support the disparate treatment. (*Heller v. Doe* (1993) 509 U.S. 312, 320 [125 L.Ed.2d 257].) Here, because a plausible basis exists for the disparity of treatment between forcible sex offenders and intentional first degree murderers, "[e]qual protection analysis does not entitle the judiciary to second-guess the wisdom, fairness, or logic of the law." (*Turnage, supra*, 55 Cal.4th at p. 74; see also *People v. Wilkes* (2020) 46 Cal.App.5th 1159, 1166 [rejecting an equal protection challenge, and distinguishing *Edwards*, on application of the carve-out provision to a defendant sentenced under the three strikes law].)

Defendant's contention lacks merit.

VII

Defendant contends the sentence imposed constitutes cruel and unusual punishment. On this issue, we agree with the court in *Edwards*: long sentences for forcible adult sex offenders do not constitute cruel and unusual punishment. (*Edwards, supra*, 34 Cal.App.5th at p. 192.)

"The Eighth Amendment to the United States Constitution applies to the states. [Citation.] It prohibits the infliction of 'cruel *and* unusual' punishment. (U.S. Const., 8th Amend., [original italics].) Article I, section 17 of the California Constitution prohibits infliction of '[c]ruel *or* unusual' punishment. [Original italics.] . . . The touchstone in each is gross disproportionality. [Citations.] Whether a punishment is cruel and/or unusual is a question of law subject to our independent review, but underlying disputed facts must be viewed in the light most favorable to the judgment. [Citations.]" (*People v. Palafox* (2014) 231 Cal.App.4th 68, 82-83.) A punishment may violate article I, section 17 of the California Constitution if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424.)

In *Edwards*, the defendants were sentenced to long aggregate terms. (*Edwards, supra*, 34 Cal.App.5th at p. 191.) On appeal, the court found, under the circumstances of the case, "no principled basis for concluding that these sentences, though each amounts to a term of life in prison, fall outside the range where a reviewing court must defer to legislative judgments on criminal sentencing. [Citation.]" (*Id*. at p. 192.)

Defendant asserts his aggregate sentence, which includes a determinate sentence of 50 years with a consecutive indeterminate sentence of 164 years to life, shocks the conscience because it serves no legitimate purpose and he could not possibly complete it. In support, he claims "the tide has turned against draconian measures in the state of California" and "the present trend in felony sentencing is to acknowledge more factors which mitigate against the extremely long sentence which have been in vogue for the past thirty years." The argument fails because the Legislature included the carve-out provision in section 3051 to exclude forcible sex offenders, such as defendant, from serving shorter terms.

While acknowledging that his crimes were serious, he observes that the crimes were committed over the course of three months, defendant was 20 years old, the victims were 19 and 22 years old, and defendant had prior consensual sexual relations with the victims. We fail to comprehend how these observations support defendant's contention that the sentence is cruel and unusual.

Defendant's contention that his sentence is cruel and unusual is without merit.

VIII

Defendant was sentenced under section 667, subdivision (a)(1) because he had a prior serious juvenile adjudication for firearm possession with an enhancement for street terrorism (§§ 186.22; 1192.7, subd. (c)(28); 29820), resulting in imposition of five additional terms of five years. Defendant contends we must remand to provide the trial court with an opportunity to exercise its newly-enacted discretion concerning whether to

strike or dismiss defendant's prior serious felony juvenile adjudication under section 667, subdivision (a)(1).

"On September 30, 2018, the Governor signed Senate Bill [No.] 1393 which, effective January 1, 2019, amends sections 667[, subdivision] (a) and 1385[, subdivision] (b) to allow a court to exercise its discretion to strike or dismiss a prior serious felony conviction for sentencing purposes. (Stats. 2018, ch. 1013, §§ 1-2.)" (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971.) In cases in which Senate Bill No. 1393 was enacted after sentencing, it is appropriate to remand to the trial court for an exercise of discretion under the amended statutes. (*Garcia,* at p. 973.)

As does the Attorney General, we agree the matter must be remanded to the trial court to exercise its newly-enacted discretion under Senate Bill No. 1393 on whether to strike, for purposes of section 667, subdivision (a)(1), defendant's prior serious juvenile adjudication for firearm possession with an enhancement for street terrorism.

IX

Defendant contends we must strike the five one-year terms imposed for defendant's prior prison term under former section 667.5, subdivision (b), which has been amended since defendant's sentencing.[4]

Signed by the Governor on October 8, 2019, and effective January 1, 2020, Senate Bill No. 136 amends section 667.5, subdivision (b), to eliminate the one-year prior prison term enhancement for most prior convictions. (Sen. Bill No. 136 (2019-2020 Reg. Sess.) § 1.) An exception, not applicable here, is made for a qualifying prior conviction on a sexually violent offense, as defined in Welfare and Institutions Code section 6600, subdivision (b).

---

[4] Defendant stated there were four one-year terms imposed under section 667.5, subdivision (b); however, as the Attorney General notes, there were five one-year terms imposed.

40

The parties agree that the amendment is retroactive and that we should strike the five one-year prior prison term enhancements imposed under former section 667.5, subdivision (b) because they are no longer authorized. We agree and will strike the one-year terms. (*People v. Smith* (2020) 46 Cal.App.5th 375, 396.)

DISPOSITION

The judgment is modified to reverse the convictions on two counts of robbery (counts 16 and 17) and to strike the five one-year prior prison term enhancements imposed under former section 667.5, subdivision (b). The judgment is affirmed as modified. The matter is remanded to the trial court to exercise its newly-enacted discretion on whether to strike, for purposes of section 667, subdivision (a)(1), defendant's prior serious juvenile adjudication for firearm possession with an enhancement for street terrorism and for any further sentencing proceedings consistent with this opinion. The trial court is directed to prepare an amended abstract of judgment and send it to the Department of Corrections and Rehabilitation after such proceedings are concluded.

/S/
MAURO, Acting P. J.

We concur:

/S/
MURRAY, J.

/S/
KRAUSE, J.

41